J-A28008-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| MELVIN R. HALDEMAN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| E. BONNIE HALDEMAN | : | |
| | : | |
| Appellant | : | No. 853 MDA 2025 |

Appeal from the Judgment Entered September 15, 2025
In the Court of Common Pleas of Lebanon County Civil Division at No(s):
2023-0-1066

BEFORE:  KUNSELMAN, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED: MARCH 10, 2026**

E. Bonnie Haldeman (Bonnie) appeals from the judgment entered in

favor of Melvin R. Haldeman (Melvin) in this civil action.  We affirm.

The trial court summarized the pertinent facts and procedural history as

follows:

> In this matter, [Melvin] sought to evict his ex-wife,
> [Bonnie], from property he had purchased at a sheriff's sale on
> June 17, 2015.  The parties had owned the property during their
> marriage, and Bonnie retained the property after the parties'
> divorce.  When the property was scheduled for sheriff's sale,
> Melvin agreed to purchase it and allow Bonnie to continue living
> there.  Thereafter, Bonnie made monthly payments in various
> amounts.  Bonnie testified that the monthly payments were
> intended to first pay off a $30,000.00 loan to Melvin and, that
> after that amount had been paid, she would make payments
> toward the price Melvin paid at the sheriff sale to purchase the
> property from him.  Melvin testified that the monthly payments
> were intended to be rent.
>
> By order and opinion entered October 8, 2024, [the trial
> court] found that Bonnie had failed to prove the existence of an

agreement for the sale of the property and directed that she vacate the property. Bonnie filed an appeal of that order to the Superior Court of Pennsylvania. The Superior Court quashed the appeal and remanded [so] that Bonnie could file post-trial motions.

Trial Court Opinion, 5/30/25, at 1-2 (excess capitalization omitted).

Following remand, Bonnie filed post-trial motions asserting that the trial court erred in finding no oral contract for the sale of the property existed and that the parties operated under a landlord-tenant relationship. By opinion and order entered May 30, 2025, the trial court denied Bonnie's post-motions. This appeal followed. Because our review of the docket entries revealed that no judgment had been entered upon the trial court's decision, we directed Bonnie to praecipe for entry of judgment. She did so, and judgment was entered upon the verdict on September 25, 2025. Both Bonnie and the trial court have complied with Appellate Rule 1925.

Bonnie raises the following four issues on appeal:

1. Whether the trial court erred and/or abused their discretion by finding that a landlord and tenant relationship existed between [Bonnie and Melvin] such that [Melvin] was entitled to have [Bonnie] evicted from the [property]?

2. Whether the trial court erred and/or abused their discretion by finding that [Melvin] is entitled to possession of the [property] and that [Bonnie] shall be ordered to vacate said premises, under the facts and circumstances in this case, which support a finding or a valid agreement of sale?

3. Whether the trial court erred and/or abused their discretion in failing to find the existence of a valid agreement of sale, using the factors under the standard set forth in *Kurland v. Stolker*, 533 A.2d 1370 (Pa. 1987), with regards to the part performance exception to the requirement that an agreement for the sale of real estate be in writing?

- 2 -

4. Whether the trial court erred and/or abused their discretion by failing to properly apply the facts in this matter to the holding in *Firetree, Ltd. v. Dept. of General Services*, 978 A.2d 1067, 1074 (Pa. Commw. 2009), as the record shows that [Bonnie] had paid compensation for the property, that [Bonnie] took possession of the property, that [her] harm cannot be compensated in damages, and that the rescission here by [Melvin] would be manifestly unfair to [Bonnie]?

Bonnie's Brief at 5 (excess capitalization omitted).[1]

On May 9, 2024, the trial court held a bench trial at which Melvin and Bonnie testified. Our scope and standard of review are as follows:

This Court's scope of review for cases tried without a jury is limited to a determination of whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. When this Court reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below and all evidence and proper inferences favorable to that party must be taken as true and all unfavorable inferences rejected. Findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed on appeal absent error of law or abuse of discretion.

*Manack v. Sandlin*, 812 A.2d 676, 679-80 (Pa. Super. 2002) (internal quotation marks and citations omitted). An abuse of discretion takes one of three forms: 1) an error of law; 2) the exercise of judgment in a manifestly unreasonable manner; or 3) a decision resulting from partiality, prejudice, bias or ill-will, as shown by the evidence of record. *Hutchinson v.*

_____

[1] We note with displeasure Bonnie's supporting argument for these four issues consists of only two sections, thereby violating Appellate Rule 2119 (providing that an appellant's "argument shall be divided into as many parts as there are questions to be argued").

***Verstraeten***, 304 A.3d 1268, 1274 (Pa. Super. 2023) (quotation marks and citation omitted). An abuse of discretion may not be found merely because the appellate court might have reached a different conclusion. ***Adkins v. Johnson & Johnson***, 231 A.3d 960, 964-65 (Pa. Super. 2020) (citation omitted).

In order to understand the trial court's legal conclusions, as well as the parties' arguments, we reproduce the trial court's discussion of the evidence in detail. Regarding Melvin's evidence, the trial court summarized:

> Melvin testified that after he purchased the property, he and Bonnie entered an oral agreement by which she would live on the property and pay him monthly rental of $1,000.00. Although Bonnie was consistent with making payments in the beginning, the payments eventually tapered off. For the part of the year Melvin owned the property in 2015, he received $8,000.00 from Bonnie. He received $10,400.00 in 2016 and $6,300.00 in 2017. After that, the payments dropped dramatically. In 2019, he received only $400.00 and[,] in 2020, he received only $1,200.00. Melvin explained that the arrangement for the $1,000.00 monthly rental had never been renegotiated and that he did not take action to evict Bonnie out of the goodness of his heart.

> Melvin produced a number of receipts for the payments he received from Bonnie. Bonnie always filled out the information on the receipts and Melvin would initial and date them after she filled in the information. She would indicate that the payment was "towards a loan," referring to the $30,000.00 loan. Melvin explained that Bonnie had said she wanted to pay back the money she owed him. However, the receipts also indicated that the payment was "for rent." Melvin testified that "I never honored that towards a loan because it's rent and my income tax filing [has] always claimed a rent." He never claimed anything on his income taxes for repayment of a loan.

> Melvin explained that he wanted to sell the property to [the parties'] daughter and son-in-law and he explained his plan to Bonnie in April 2023. He hand-delivered an eviction notice to

Bonnie on June 7, 2023 which gave her 45 days to vacate the property and read the terms to her. Bonnie failed to move out within the 45 days indicated in the notice.

Melvin acknowledged that Bonnie had mentioned to him that she wanted to remain living on the property and suggested the possibility of entering a rent-to-own agreement. However, he had always avoided her questions when she mentioned such an arrangement. He testified that the two had never discussed a purchase price, a term, an itemization schedule or any specifics to suggest that they were entering [into] a rent-to-own agreement. When asked whether he understood that Bonnie intended to live on the property for the rest of her life, Melvin responded: "Well correct. But in time, I wanted to sell this place and rent it and that wasn't going to work out that way."

On cross-examination, Melvin explained that when the property went up for sheriff's sale, he informed Bonnie that he was interested in purchasing it. At first, he denied that Bonnie asked him to purchase it so that she could continue to live there. However, he later acknowledged that Bonnie went to the sale with him and informed him that she wanted to remain on the property and asked him to purchase it. He acknowledged that he bought the property at the sale for $171,500.00 and that the property is now worth approximately $300,000.00.

Melvin acknowledged that the last check he received from Bonnie was in the amount of $700.00. Bonnie indicated on the check that it was the final payment on the $30,000.00 loan and that, from that time, payments would go toward the $171,500.00 purchase price of the property. Melvin did not cash the check. Melvin acknowledged that he had at least one conversation with Bonnie about her purchasing the property but he could not recall the specifics of any discussion. Melvin confirmed that when Bonnie made payments, he had asked her to check "rent" on the receipt because of how he claimed the income on his taxes.

On re-direct examination, Melvin explained that the $400.00 rental amount set forth in the complaint was based on the amount of Bonnie's recent payments. Melvin explained that he paid the real estate taxes and Bonnie was responsible for utilities. He always understood that they were rental payments and none of the payments were applied toward a loan. He stated that he never expected to receive repayment of the $30,000.00 loan.

Trial Court Opinion, 10/8/24, at 3-6 (excess capitalization and citations to record omitted).

The trial court summarized Bonnie's evidence as follows:

> Bonnie testified that after her second divorce, she was unable to work due to a disability and that she was no longer receiving alimony payments. As a result, she had difficulty paying the mortgage and the mortgage went into default. She applied for and received a $35,000.00 loan from the Pennsylvania Housing Finance Agency. At the time of the hearing, she was still paying off that loan at the rate of $25.00 per month.
>
> When the property was listed for sheriff's sale, she contacted Melvin and asked him to buy the property because she wanted to continue living there. They discussed that she would purchase the property from him after he bought it. Under their agreement, she would repay the $30,000.00 loan first and would then start making payments toward the $171,500.00 purchase price. She explained that when she filled out a receipt, she always indicated that it was in payment toward the loan and she would indicate how much remained on the loan until she would start paying the $171,500.00. She noted that Melvin never disputed the $30,000.00 loan and asked her to put "rent" on the receipt for tax purposes.
>
> Bonnie explained that the final check given to Melvin in the amount of $700.00 would have paid off the $30,000.00 and that she would have started on the $171,500.00 the following month. She and Melvin had discussed the arrangement many times since the sheriff's sale. She based her payments on what she could afford to pay as her only source of income was social security payments. Melvin never discussed rent with her.

Trial Court Opinion, 10/8/24, at 6-7 (excess capitalization omitted).

The trial court then quoted an exchange between Bonnie and her counsel in which Bonnie testified that she spoke with Melvin before the sheriff's sale and Melvin stated a third person offered to loan Melvin the money to buy the property but only if Bonnie's name was removed from the deed. *Id.* at 7.

- 6 -

Bonnie testified that when she accused Melvin of "trying to take the property from" her, Melvin denied this, and told her she could continue to live there. *Id.* According to Bonnie, she gave Melvin "a check for $700 which would have paid off the $30,000 and he refused to cash it." Bonnie further testified that Melvin told her he forgot about that loan, but she "questioned that because we discussed it." *Id.*

In addition to the above, we note that, after the parties presented their evidence, the trial court had a "question or two" to ask Bonnie because the court wanted "to make it clear to [the court] what was actually happening." N.T., 5/9/24, at 46. After going over some of her previous testimony, the following exchange occurred:

> Q. None of [your payments] you believe [were] for rent?
>
> A. Correct.
>
> Q. So - -
>
> A. At some point we did discuss Hannah, my daughter, and [her husband], we discussed an apartment above a new garage for me because my health is declining. But I never dreamed that I - - had never had a clue that [Melvin] was going to actually kick an elderly, the mother of his children - -
>
> Q. Let me ask this question. Should I conclude that from what you said that you were actually living rent-free at [the property]? You were not paying rent, you were just repaying this loan?
>
> A. That's a hard question to answer.
>
> Q. Well I guess I'm assuming based upon what you just testified to - -
>
> A. I was - -

Q.    Let me ask, that when you made a payment, you were not considering that to be rent, you were considering that to be a payment on the $30,000 loan.  The full amount of whatever the payment was, was coming off the $30,000 loan?

A.    I guess it felt like rent too because I kept checking the rent box.

Q.    Well you explained that you checked the rent box because [Melvin] asked you to do that for tax purposes?

A.    Yeah.

Q.    But you didn't say that you thought that because you thought you were paying rent, you just did it for that reason[,] right?  And I'm not trying to confuse you, I'm just trying to be clear about was your thought was.

A.    I don't know.

Q.    Okay.

A.    I mean I wanted to make sure [Melvin] was getting money, whether - - I don't know how to answer that[.]

*Id.* at 47-49.

As noted above, the trial court concluded that the parties had a landlord-tenant relationship and that Bonnie could not rely on her alleged oral rent-to-own contract because it violated the statute of frauds.

In her first two issues on appeal, Bonnie asserts that, under the Pennsylvania Landlord and Tenant Act, 68 P.S. §§ 250.101-342, Melvin failed to meet his burden of proving either a written lease agreement between the parties or the terms of an oral one.  According to Bonnie, because Melvin "has not met his burden of proof as it relates to the existence of a lease agreement between himself and [Bonnie]," the trial court "cannot grant relief sought by [Melvin] under the Landlord and Tenant Act."  Bonnie's Brief at 10-11.

Before addressing the merits of this claim, we must determine whether it is properly before us. In both her post-trial motion and her Rule 1925(b) statement, Bonnie made the general claim that the trial court erred in concluding that she and Melvin had a landlord-tenant relationship. Bonnie did not claim, as she does in her brief, that Melvin did not establish either the terms of an oral lease or the existence of a written lease. The trial court did not address these more specific contentions. Thus, we conclude the claim is waived because Bonnie inappropriately raises it for the this first time on appeal. *See generally*, Pa.R.A.P. 302(a).

Nonetheless, our review of the record supports the trial court's conclusion that Melvin credibly testified that he and Bonnie entered into an open-ended oral lease arrangement. As the court explained when denying Bonnie's post-trial motions:

> In [its October 8, 2024 opinion, the court] noted that the parties did not ever formally express to one another the terms of their relationship. In the complaint and in his testimony, Melvin explained that after he purchased the property at the sheriff sale, it was simply agreed that Bonnie would make monthly payments in order to continue living there.
>
> We concluded that the arrangement was more in the nature of a landlord-tenant relationship due to the absence of any agreement of sale and based on the parties' conduct. The parties agreed that Bonnie made some monthly payments to Melvin in varying amounts. Bonnie testified that the first series of payments were meant to repay the $30,000.00 loan Melvin had extended to her and that none of the payments she made were meant to go toward the purchase price of the property. When Bonnie made the payments, she filled out a receipt where she indicated that the payment was "towards a loan." However, she also placed a notation on the receipts that the payments were "for rent." Melvin

- 9 -

explained that he reported the payments as rental income on his taxes and that he never intended to collect on the $30,000.00 loan. Melvin rejected payment from Bonnie once she indicated that the loan had been paid off and that future payments would go toward the purchase of the property.

Trial Court Opinion, 5/30/25, at 3-4 (excess capitalization omitted).

Upon review, we discern no error of law or abuse of discretion by the court in defining the arrangement of the parties regarding the property at issue. *Manack*, *supra*. Thus, Bonnie's first two issues are meritless.

In her remaining two issues, Bonnie asserts that the trial court erred in failing to find that she and Melvin "had a valid and enforceable agreement for purchase of the real property[.]" Bonnie's Brief at 11. Although she concedes that there was no written agreement, Bonnie asserts that she met her burden of proving an exception to the statute of frauds. We disagree.

The parties cite, and the trial court relied upon, our Supreme Court's decision in *Kurland v. Stolker*, 533 A.2d 1370 (Pa. 1987). In *Kurland*, the high court explained the purpose of the statute of frauds and an exception thereto as to oral contracts for the purchase of property:

> The object of the statute is to prevent the assertion of verbal understandings in the creation of interests or estates in land and to obviate the opportunity for fraud and perjury. It is not a mere rule of evidence, but a declaration of public policy. In the absence of equities sufficient of themselves to take the case out of the statute, it operates as a limitation upon judicial authority to afford a remedy unless renounced or waived by the party entitled to claim its protection.
>
> Our case law is very explicit as to the requirements which must be met to take an oral contract for real estate out of the statute. The terms of the contract must be shown by full, complete, and satisfactory proof. The evidence must define the

- 10 -

boundaries and indicate the quantity of the land. It must fix the amount of consideration. It must establish the fact that possession was taken in pursuance of the contract, and, at or immediately after the time it was made, the fact that the change of possession was notorious, and the fact that it has been exclusive, continuous and maintained. And it must show performance or part performance by the vendee which could not be compensated in damages, and such as would make rescission inequitable and unjust.

*Kurland*, 533 A.2d at 1372-73 (internal citations omitted).

Our Supreme Court further stated:

The "indubitable proof" a claimant is required to proffer is evidence that should not only be found credible, but of such weight and directness as to make out the facts alleged *beyond a doubt*. As the alleged contract is not between a parent and child, it may be proven by the acts and declarations of the parties, either together or separately. The acts and declarations relied upon, must not, however, be of an equivocal character; they must have such clearness and directness as will leave no doubt as to their meaning and purpose.

*Id.* The burden of proof falls upon the party attempting to avoid the statute of frauds. *Id.* at 1374. Moreover, "[t]he contract cannot be inferred only from the declarations of one of the parties. To hold otherwise is tantamount to setting aside the statute of frauds." *Id.* at 1375.

Here, the trial court concluded that Bonnie did not meet her burden of establishing that the partial performance exception applied and, therefore, her claim of an oral agreement to sell the property violated the statute of frauds. The court reasoned:

It is true that Bonnie was in continuous exclusive possession of the property as she was permitted to remain there after Melvin purchased the property at the sheriff's sale. However, the acts relied upon by Bonnie were not of such an unequivocal nature that

- 11 -

[the court was] left with no doubt that the parties had entered a valid oral contract for the sale of the property. Melvin paid the real estate taxes on the property and Bonnie paid the utilities, which is indicative of a typical landlord-tenant relationship. The monthly receipts were filled out by Bonnie and included notations indicating that the payments were for both rent and repayment of a loan. ***There was no partial performance on the terms of the alleged oral agreement as Bonnie acknowledged that none of the payments accepted by Melvin went toward the purchase price.*** As soon as she indicated that her monthly payment was to be put toward the purchase price, Melvin refused to accept it and notified her that he would be selling the property to the parties' daughter and son-in-law. Bonnie did not claim that she had made any improvements to the property which could not be compensated in damages. Although Bonnie expressed her desire to eventually purchase the property, we found that Melvin never acquiesced to any type of arrangement of that nature. It appeared that Melvin viewed Bonnie's inquiries regarding her purchase of the property as wishful thinking and that he did not want to upset her by engaging in any discussions about a sale with her.

Trial Court Opinion, 5/30/25, at 5-6 (excess capitalization omitted; emphasis added).

Our review of the record amply supports the trial court's conclusions. *See Morris v. Smith*, 584 A.2d 331, 333 (Pa. Super. 1990) (holding, in a similar landlord-tenant action, that the tenants failed to plead an enforceable contract sufficient to remove the case from the statute of frauds requirement that an agreement for sale of real property be in writing and signed by the parties).

In arguing to the contrary, Bonnie largely relies on her own testimony. However, as stated above, "[t]he contract cannot be inferred only from the declarations of one of the parties." **Kurland**, **supra**. Moreover, Bonnie's own testimony established that she did not partially perform under the "contract," given her testimony that all payments accepted by Melvin were made toward an unrelated loan. Thus, Bonnie's final two issues fail.[2]

In sum, our review of the evidence supports the trial court's conclusions that the parties operated under a landlord-tenant relationship and that Bonnie failed to establish that she partially performed under an oral rent-to-own agreement to take the contract for the sale of the house outside the statute of frauds.

Judgment affirmed.

---

[2] Although Bonnie cites **Firetree**, **supra**, in her fourth issue, she does not reference this decision further in her supporting argument. Thus, we need not consider the case further. **See Commonwealth v. Tielsch**, 934 A.2d 81, 93 (Pa. Super. 2007) (holding that undeveloped claims will not be considered on appeal).

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>03/10/2026</u>